# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

|  |  |
|---|---|
| **LORI YOUNG, individually and on behalf of all others similarly situated,**<br><br>   *Plaintiff*,<br><br><br>   **v.**<br><br>**AT&T MOBILITY, LLC, and AT&T INC.,**<br><br>   *Defendants.* | Case No.:_____ |

## JURY TRIAL DEMANDED

## CLASS ACTION COMPLAINT

Plaintiff Lori Young, ("Plaintiff") brings this Class Action Complaint against AT&T Mobility LLC, and AT&T Inc., (collectively, "Defendants" or "AT&T") as individuals and on behalf of all others similarly situated, and alleges, upon personal knowledge as to Plaintiff's own actions and to counsels' investigation, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.  Plaintiff brings this class action against AT&T for its failure to properly secure and safeguard the personally identifiable information ("PII") and/or customer proprietary network information ("CPNI")[1] that was accessed and exfiltrated in a data breach.

---

[1] Collectively, personally identifiable information and customer proprietary network information is referred to as "PII."

2.      AT&T is one of the largest consumer brands in the United States.  In 2023, AT&T had a total of 241.53 million wireless subscribers[2] and it collects immense amounts of personal information related to its customers.

3.      AT&T acknowledges its responsibility to protect the personal data it collects and assures consumers, through its Privacy Notice, that their "privacy is important" and explains how AT&T attempts to keep customer data safe.[3]  With respect to data security, AT&T states, "[w]e work hard to safeguard your information using technology controls and organizational controls. We protect our computer storage and network equipment. We require employees to *authenticate* themselves to access sensitive data."[4]

4.      Earlier this year, cybercriminals figured out that many major companies, including AT&T, have uploaded massive amounts of valuable and sensitive customer data to Snowflake servers.  Snowflake is a third-party cloud platform.  Cybercriminals targeted Snowflake accounts that did not require users to authenticate themselves prior to accessing sensitive data.[5]

5.      On July 12, 2024, AT&T announced that customer data was illegally downloaded from its workspace on a third-party cloud platform (hereafter, the "Data Breach").  Upon information and belief, the Data Breach affected more than 100 million AT&T customers and Snowflake is the third-party cloud platform involved.

6.      The downloaded data included phone call and text message records of nearly all of AT&T cellular customers from May 1, 2022 to October 31, 2022 and January 2, 2023.  The

---

[2] https://www.statista.com/statistics/220692/number-of-atundt-wireless-subscribers-since-2007/ (last accessed May 21, 2024).
[3] https://about.att.com/privacy/privacy-notice.html (last accessed May 21, 2024).
[4] https://about.att.com/privacy/privacy-notice.html (last accessed May 21, 2024).
[5] *See, Crooks Steal Phone, SMS Records for Nearly All AT&T Customers,* https://krebsonsecurity.com/2024/07/hackers-steal-phone-sms-records-for-nearly-all-att-customers/ (last accessed July 16, 2024).

compromised data also includes cell site identification numbers, and phone numbers that AT&T wireless customers interacted with during this time, including AT&T landline (home phone) customers.

7.      AT&T completely and utterly failed to protect its customers' personal data and/or ensure that its third-party vendors protected customer data consistent with AT&T's privacy notice. In fact, AT&T has acknowledged that multi-factor authentication was not required to access the sensitive customer records that were exposed in the Data Breach.

8.      Although AT&T learned of the Data Breach in April 2024, Defendants did not notify Plaintiff of the Data Breach until July 2024. Omitted from the data breach notice letter were the details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these omitted details have not been explained or clarified to Plaintiff, who retains a vested interest in ensuring that their PII/CPNI remains protected.

9.      Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiff's PII was a known risk to AT&T, and thus, AT&T was on notice that failing to take the necessary steps to secure the PII from those risks left the data in a dangerous condition.

10.     The Data Breach was a direct result of AT&T's failure to implement reasonable safeguards to protect PII from a foreseeable and preventable risk of unauthorized disclosure. Had AT&T implemented reasonable administrative, technical, and/or physical controls consistent with industry standards and best practices, it could have prevented the Data Breach.

11.     AT&T's conduct resulted in the unauthorized disclosure of Plaintiff's private information to cybercriminals. The unauthorized disclosure of Plaintiff's PII constitutes an

invasion of a legally protected privacy interest, that is traceable to AT&T's failure to adequately secure the PII in its custody, and has resulted in actual, particularized, and concrete harm to the Plaintiff. Plaintiff suffered actual injury in the form of damages to and diminution in the value of the PII that was compromised as a result of the Data Breach. The injuries Plaintiff suffered, as described herein, can be redressed by a favorable decision in this matter.

12.     AT&T has not provided any assurances that: all data acquired in the Data Breach, or copies thereof, have been recovered or destroyed; or, that AT&T has modified its data protection policies, procedures, and practices sufficient to avoid future, similar, data breaches.

13.     AT&T's conduct, as evidenced by the circumstances of the Data Breach, has created a substantial risk of future identity theft, fraud, or other forms of exploitation. The circumstances demonstrating a substantial risk of future exploitation include, but are not limited to:

   a.  **Data Type**: The data acquired in the Data Breach included unencrypted phone numbers and cell site identification numbers, which can be used to perpetuate fraud, identity theft, and other types of exploitation. For example, this data can be used in SIM swapping scams, port-out fraud,[6] and Smishing attacks.[7] These scams work as follows:
      - Subscriber Identity Module (SIM) Swapping – A bad actor convinces a victim's wireless carrier to transfer the victim's service from the victim's cell phone to a cell phone in the bad actor's possession. This is called "SIM swapping" because it involves an account being fraudulently transferred (or swapped) from a device associated with one SIM to a device associated with a different SIM.
      - Port-Out Fraud – A bad actor, posing as the victim, opens an account with a carrier other than the victim's current carrier. The bad actor then arranges for the victim's phone number to be transferred to (or "ported out") to the account with the new carrier controlled by the bad actor.
      - Smishing Scams – Occurs when a bad actor uses deceptive text messages to lure consumers into providing their personal or financial information. The scam artists that send smishing messages often impersonate a government agency, bank, or other company to lend legitimacy to their claims. Smishing messages typically ask consumers

---

[6] https://www.ccmi.com/fcc-will-update-cpni-rules-to-stop-data-breaches/ (last accessed May 21, 2024).
[7] *See*, https://www.fcc.gov/avoid-temptation-smishing-scams (last accessed May 21, 2024).

to provide usernames and passwords, credit and debit card numbers, PINs, or other sensitive information that scam artists can use to commit fraud.

b. **Data Breach Type**: This was a targeted attack, orchestrated by a hacker that is part of the ShinyHunters hacking group. ShinyHunters has been linked to a string of high-profile data breaches resulting in millions of dollars in losses. In 2021, ShinyHunters stole a database of personal information regarding 70 million AT&T customers and then sold the data on the dark web.[8] Furthermore, since 2020, ShinyHunters has stolen over 900 million customer records in a series of high-profile data breaches (*e.g.*, GitHub, Pizza Hut). Upon information and belief, ShinyHunters has accumulated enough personal information from that series of data breaches to be able to commit identity theft, fraud, or other forms of exploitation.

c. **Data Misuse**: Upon information and belief, AT&T paid a $370,000.00 ransom to the ShinyHunters hacker. Prior to paying the ransom, the unidentified hacker disclosed the data to another notorious hacker, John Erin Binns. While the stolen data does not include customer names, there are ways, using publicly available online tools, to identify the individual associated with a specific telephone number. Once a specific individual is identified, the stolen data can then be used to "identify key relationships, pinpoint vulnerabilities, and craft highly sophisticated attacks"[9] like social engineering-based attacks. A social engineering attack is a method of using psychological manipulation to deceive a victim and gain access to a computer system or to steal sensitive information such as login credentials. Social engineering attacks that can be launched using names, telephone numbers and email addresses include phishing, smishing (SMS message), vishing (voice messaging), pretexting, and baiting attacks.

14. The imminent risk of future harm resulting from the Data Breach is traceable to the AT&T's failure to adequately secure the PII in its custody, and has created a separate, particularized, and concrete harm to the Plaintiff.

15. More specifically, the Plaintiff's exposure to the substantial risk of future exploitation caused her to: (i) spend money on mitigation measures like credit monitoring services and/or dark web scans and monitoring; (ii) lose time and effort spent responding to the Data Breach, like finding where the data is exposed and at risk; (iii) spend money removing data from risky databases or deleting it from data broker databases; and/or (iv) experience emotional distress

---

[8] *See*, *Data allegedly stolen from 560 million Ticketmaster users*, https://www.bbc.com/news/articles/c899pz84d8zo (accessed June 11, 2024).
[9] https://therecord.media/att-ransom-data-breach (accessed July 16, 2024).

associated with reviewing accounts for fraud, changing usernames and passwords or closing accounts to prevent fraud, and general anxiety over the consequences of the Data Breach. The harm Plaintiff suffered can be redressed by a favorable decision in this matter.

16.     Plaintiff faces a substantial risk of future spam, phishing, or other social engineering attacks where their full names, addresses, email addresses, and phone numbers can be readily accessed by cybercriminals, known for stealing and reselling personal data on the dark web. The potential exposure of call data records is particularly alarming, according to Secure Cyber Defense CEO Shawn Waldman, because this type of data allows hackers to pinpoint locations based on phone numbers. Furthermore, Jake Williams, a former hacker for the National Security Agency, said call data records "are a gold mine in intelligence analysis because they can be used to understand who is talking to who — and when." This type of information can be used to craft highly sophisticated attacks. Additionally, threat actors may use the data to circumvent SMS-based multifactor authentication security measures.[10]

17.     Names, telephone numbers, and cell site identification numbers can be used by cybercriminals to launch social engineering attacks designed to trick individuals into giving away sensitive information. Therefore, Plaintiff must incur out of pocket costs for purchasing products to protect from phishing, smishing (SMS message), vishing (voice messaging), pretexting, and other sophisticated attacks.

18.     Armed with the PII acquired in the Data Breach, data thieves have already engaged in theft and can, in the future, commit other forms of exploitation.

19.     As a result of the Data Breach, Plaintiff suffered injuries including, but not limited to: (i) invasion of privacy; (ii) theft of PII; (iii) lost or diminished value of PII; (iv) lost time and

---

[10] https://therecord.media/att-ransom-data-breach (accessed July 16, 2024).

opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) an increase in spam calls, texts, and/or emails; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and increased risk her PII will be further misused, where: (a) her data remains unencrypted and available for unauthorized third parties to access; and (b) remains backed up under AT&T's possession or control and is subject to further unauthorized disclosures so long as AT&T fails to implement appropriate and reasonable measures to protect the data.

20.    Plaintiff brings this class action lawsuit individually, and on behalf of all those similarly situated, to address AT&T's inadequate data protection practices and for failing to provide timely and adequate notice of the Data Breach.

21.    Through this Complaint, Plaintiff seeks to remedy these harms individually, and on behalf of all similarly situated individuals whose PII was accessed during the Data Breach. Plaintiff has a continuing interest in ensuring that personal information is kept confidential and protected from disclosure, and Plaintiff should be entitled to injunctive and other equitable relief.

## **JURISDICTION & VENUE**

22.    This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. §1332, because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000.00, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class, including Plaintiff, is a citizen of a state different from Defendants.

23.    This Court has personal jurisdiction over Defendants because one of the Defendants' principal place of business is in this District, Defendants have purposefully availed themselves of the laws, rights, and benefits of the forum state by registering to do business and

selling products or services within this District, Defendants have sufficient minimum contacts with the forum state such that jurisdiction in this District is proper, and the events giving rise to Plaintiff's claims occurred in this District .

24.     Venue is proper under 28 U.S.C §1391(b) because one Defendant maintains a principal place of business in this District, a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in and emanated from this District, and at least one Defendant is subject to the personal jurisdiction in this District.

## PARTIES

25.     Plaintiff Lori Young is a citizen of the State of South Carolina. At all relevant times, Plaintiff Young has been a resident of Lugoff, Kershaw County, South Carolina. Plaintiff Young purchased television and telephone services from AT&T.

26.     Defendant AT&T Mobility LLC is a Delaware limited liability company with its principal office or place of business at 1025 Lenox Park Boulevard NE, Atlanta, Georgia, 30319.

27.     Defendant AT&T Incorporated is a Delaware corporation with a principal office or principal place of business at 208 S. Akard Street, Dallas, Texas 75202.

## FACTUAL ALLEGATIONS

**(A)    AT&T Collects, Stores, and Profits from Customer Information, and Promises to Keep it Secure.**

28.     Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

29.     To run its business, AT&T collects, maintains, and profits from the PII of millions of its U.S. consumers.

30.     Upon information and belief, AT&T uses PII for Social Network Analysis on its customers' call logs and locations for marketing purposes. Social Network Analysis (SNA)

characterizes networked structures in terms of nodes (individual actors, people, or things within the network) and the ties, edges, or links (relationships or interactions) that connect them.

31.     Common SNA applications include data aggregation and mining, user attribute and behavior analysis, location-based interaction analysis, customer interaction and analysis, marketing, and business intelligence.

32.     AT&T's Privacy Notice applies to anyone who uses AT&T products and services, including internet, wireless, voice and applications.[11] The Privacy Notice provides that customer information is used to: (i) create additional products and services and create customized offers for its customers; (ii) design and deliver advertising, marketing and promotional campaigns to customers and measure their effectiveness; and (iii) conduct research and create reports that offer business and marketing insights about groups of customers.[12]

33.     AT&T also uses cookies, mobile advertising identifiers, and other technologies to collect information about customers' use of websites, which can be used to analyze and track online activity or deliver ads and content tailored to a customer's specific interests.

34.     In addition to listing the ways AT&T benefits and profits from its customers' personal information, the Privacy Notice states: "[we] work hard to safeguard your information using technology controls and organizational controls. We protect our computer storage and network equipment. We require employees to authenticate themselves to access sensitive data. We limit access to personal information to the people who need access for their jobs."

**(B)     Despite Its Promises, AT&T Failed to Protect Customer Data**

---

[11] https://about.att.com/privacy/full_privacy_policy.html  (last accessed July 16, 2024).
[12] https://about.att.com/privacy/full_privacy_policy.html  (last accessed July 16, 2024).

35.     AT&T promised to use reasonable technical, and administrative safeguards to protect the PII it collected.  These promises were contained in the applicable privacy policy, the website, and through other disclosures in compliance with statutory privacy requirements.

36.     AT&T acknowledges that customers depend on AT&T to protect them from cyberattacks and that it has a responsibility to safeguard customer information.  AT&T represents that "Security is at the core of our network and central to everything we do."[13]

37.     To that end, AT&T represents that it has implemented what it calls "AT&T Security Policy and Requirements (ASPR)" to ensure information resources are protected.  The ASPRs are supposed to be a "comprehensive set of security control standards based, in part, on leading industry standards such as ISO/IEC 27001:2013" and the National Institute of Standards and Technology (NIST) cybersecurity framework and NIST 800-53.[14] ASPR applies to all employees and contractors and establishes the minimum required safeguards to protect computing and networking assets, data and services.

38.     Plaintiff and Class Members (later defined) are current and former customers of AT&T's various services. Plaintiff and the Class Members, as customers of AT&T, relied on these representations and on this sophisticated business entity to keep their PII confidential, securely maintained, and to make only authorized disclosures of this information.

39.     On, or about, July 12, 2024, AT&T announced that a cloud-services vendor they use experienced a data breach, which exposed the personal data of over 100 million customers.

40.     AT&T has acknowledged that multi-factor authentication was not required to access the sensitive customer records that were exposed in the Data Breach.

---

[13] *Network & Data Security*, https://sustainability.att.com/priority-topics/network-data-security (last accessed July 16, 2024).

[14] *Network & Data Security*, https://sustainability.att.com/priority-topics/network-data-security (last accessed July 16, 2024).

**(C)    AT&T Has A History of Significant Data Breaches**

41.    AT&T is no stranger to cybersecurity incidents, as multiple data breaches have occurred in the past decade. In 2015, AT&T agreed, in cooperation with the Federal Communications Commission to pay $25 Million to settle three consumer privacy investigations.[15]

42.    In May 2014, the Enforcement Bureau launched its investigation into a 168-day data breach that took place at an AT&T call center in Mexico between November 2013 and April 2014. During this period, three call center employees were paid by third parties to obtain customer information — specifically, names and at least the last four digits of customers' Social Security numbers — that could then be used to submit online requests for cellular handset unlock codes. The three call center employees accessed more than 68,000 accounts without customer authorization, which they then provided to third parties who used that information to submit 290,803 handset unlock requests through AT&T's online customer unlock request portal.

43.    According to a subsequent investigation by the FCC's Enforcement Bureau, these data breaches occurred when employees at call centers used by AT&T in Mexico, Colombia, and the Philippines accessed customer records without authorization. These employees accessed CPNI while obtaining other personal information that was used to request handset unlock codes for AT&T mobile phones, and then provided that information to unauthorized third parties who appear to have been trafficking in stolen cell phones or secondary market phones that they wanted to unlock.[16]

44.    In August 2021, the personal data of over 70 million AT&T customers was compromised in a data breach.

---

[15]    https://www.fcc.gov/document/att-pay-25m-settle-investigation-three-data-breaches-0 (last accessed May 21, 2024).
[16]    https://www.fcc.gov/document/att-pay-25m-settle-investigation-three-data-breaches-0 (last accessed May 21, 2024).

45.    In August 2022, a cybersecurity firm discovered personal data of 23 million AT&T customers had been disclosed on the dark web. The data included full names, phone numbers, street addresses, email addresses, dates of birth, and social security numbers.[17]

**(D)    This Data Breach Was Avoidable**

46.    Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiff's PII was a known risk to AT&T, and thus, AT&T was on notice that failing to take steps necessary to secure the PII from those risks left the data in a dangerous condition.

47.    Upon information and belief, the Data Breach was a direct result of AT&T's failure to: (i) identify risks and potential effects of collecting, maintaining, and sharing personal information; (ii) adhere to its published privacy practices; (iii) implement identity and access management (IAM) policies and technology to ensure that the correct users have the appropriate access to technology resources; (iv) implement multifactor authentication in cloud environments and require users to provide more than one form of identification before accessing systems, applications, or services; (v) implement reasonable data protection measures for the collection, use, disclosure, and storage of personal information; and/or (vi) ensure its third-party vendors were required to implement reasonable data protection measures consistent with AT&T's data protection obligations.

48.    Upon information and belief, the Data Breach occurred as the result of a ransomware attack. In a ransomware attack, the attackers use software to encrypt data on a compromised network, rendering it unusable and then demand payment to restore control over the

---

[17] https://holdsecurity.com/news/2022/08/at-t-customer-data-found-on-the-dark-web/

network.[18] Ransomware groups frequently implement a double extortion tactic, "where the cybercriminal posts portions of the data to increase their leverage and force the victim to pay the ransom, and then sells the stolen data in cybercriminal forums and dark web marketplaces for additional revenue."[19]

49.     To prevent cyber-attacks like the one involved here, AT&T could and should have implemented ISO 27017, which is part of the ISO/IEC 27000 family and is an information security framework for organizations using cloud services. The standard advises both cloud service customers and cloud service providers, with the primary guidance laid out side-by-side in each section.

50.     ISO/IEC 27017 is a standard that focuses on addressing the data privacy and security requirements for organizations using cloud services. An overview of the standard is as follows:

Overview of ISO/IEC 27017

a.  **Scope**: ISO/IEC 27017 provides guidance to cloud service customers on the implementation of information security controls within the context of their use of cloud services. It complements the existing ISO/IEC 27001 standard, which is a broader information security management system (ISMS) standard.

b.  **Objectives**: The standard aims to help organizations protect the confidentiality, integrity, and availability of their information in the cloud environment. It provides guidelines for addressing the risks associated with cloud computing and ensures that cloud service customers maintain control over their data.

c.  **Data Classification & Handling**: ISO/IEC 27017 emphasizes the importance of classifying data based on its sensitivity and defining appropriate handling and security measures for each classification. It provides guidance on data encryption, access controls, data segregation, and data retention.

d.  **Security Responsibilities**: The standard clarifies the division of security responsibilities between the cloud service customer and the cloud service provider.

---

[18] *Ransomware FAQs*, https://www.cisa.gov/stopransomware/ransomware-faqs (accessed June 11, 2024).
[19] *Ransomware: The Data Exfiltration and Double Extortion Trends*, https://www.cisecurity.org/insights/blog/ransomware-the-data-exfiltration-and-double-extortion-trends (accessed June 11, 2024).

It outlines the areas where the customer retains control and where the provider assumes responsibility. This helps establish clear expectations and accountability for security measures.

e. **Supplier Management**: ISO/IEC 27017 emphasizes the need for cloud service customers to assess the security capabilities of their cloud service providers. It provides guidance on selecting trustworthy providers, establishing contractual agreements, and monitoring the provider's compliance with security requirements.

f. **Incident Management**: The standard addresses incident management processes in the cloud environment. It provides guidance on incident reporting, investigation, and response to ensure timely and effective handling of security incidents.

g. **Continual Improvement**: ISO/IEC 27017 promotes a continual improvement approach to information security in the cloud. It encourages organizations to regularly review and update their security controls, assess emerging risks, and implement necessary improvements.

51.    ISO/IEC 27017 provides guidance on multi-factor authentication (MFA) as a security control for cloud service customers.   The standard provides, among other things, the following security requirements:

a. **Authentication Requirements**: The standard emphasizes the importance of strong authentication mechanisms for accessing cloud services. It recommends the use of MFA as an effective method to enhance the security of user authentication. MFA requires users to provide multiple forms of identification, such as a password and a unique code or biometric factor, to verify their identity.

b. **Risk Assessment**: ISO/IEC 27017 encourages cloud service customers to conduct a risk assessment to determine the level of authentication controls required based on the sensitivity of the data and the potential impact of unauthorized access. MFA is often recommended for high-risk or sensitive applications or data.

c. **Access Controls**: The standard provides guidance on implementing access controls in the cloud environment. It suggests that MFA should be used as an additional layer of security in conjunction with other access control measures such as strong passwords, role-based access control (RBAC), and least privilege principles.

d. **User Management**: ISO/IEC 27017 highlights the need for effective user management practices in the cloud. It recommends implementing MFA for user accounts with administrative privileges or access to sensitive data. This helps prevent unauthorized access even if the user's password is compromised.

e. **Supplier Management**: The standard advises cloud service customers to assess the authentication capabilities of their cloud service providers. It recommends

14

selecting providers that offer robust MFA options and have appropriate controls in place to protect customer data.

f. **Compliance Monitoring**: ISO/IEC 27017 suggests that organizations should monitor and review the effectiveness of their MFA controls regularly. This includes monitoring user access logs, analyzing authentication success/failure rates, and promptly addressing any security incidents or vulnerabilities related to authentication.

52.    By addressing MFA in these ways, ISO/IEC 27017 helps cloud service customers, like AT&T, strengthen their authentication processes, reduce the risk of unauthorized access, and enhance the overall security of their cloud services.

53.    Given that AT&T has implemented what it calls "AT&T Security Policy and Requirements (ASPR)" that are based, in part, on leading industry standards such as ISO/IEC 27001, AT&T could and should have identified the risks and potential effects of collecting, maintaining, sharing, and storing personal information in cloud environments as detailed above.

54.    Without identifying the potential risks to the personal data in AT&T's possession, AT&T could not identify and implement the necessary measures to detect and prevent cyberattacks. The occurrence of the Data Breach indicates that AT&T failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and the exposure of Plaintiff's and Class Members' PII.

55.    AT&T knew and understood unencrypted PII is valuable and highly sought after by cybercriminals. At all relevant times, AT&T knew, or reasonably should have known, of the importance of safeguarding PII in cloud environments and of the foreseeable consequences that would occur if a data breach occurred, including the significant cost that would be imposed on Plaintiff and Class Members as a result.

**(E)    Plaintiff and Class Members Sustained Damages in the Data Breach**

56.     The invasion of the Plaintiff's and Class Members' privacy suffered in this Data Breach constitutes an actual, particularized, redressable injury traceable to the AT&T's conduct. As a consequence of the Data Breach, Plaintiff and Class Members sustained monetary damages that exceed the sum or value of $5,000,000.00.

57.     Additionally, Plaintiff and Class Members face a substantial risk of future identity theft, fraud, or other exploitation where their PII was targeted by a sophisticated hacker known for stealing and reselling sensitive data on the dark web. The substantial risk of future identity theft and fraud created by the Data Breach constitutes a redressable injury traceable to the AT&T's conduct.

58.     Furthermore, Plaintiff and Class Members face a substantial risk of future spam, phishing, or other attacks designed to trick them into sharing sensitive data, downloading malware, or otherwise exposing themselves to cybercrime, where their names, cellular data, and contact information were acquired in the Data Breach. The substantial risk of future exploitation created by the Data Breach constitutes a redressable injury traceable to the AT&T's conduct.

59.     Upon information and belief, a criminal can easily link data acquired in the Data Breach with information available from other sources to commit a variety of fraud related crimes. An example of criminals piecing together bits and pieces of data is the development of "Fullz" packages.[20] With "Fullz" packages, cyber-criminals can combine multiple sources of PII to apply for credit cards, loans, assume identities, or take over accounts.

---

[20] "Fullz" is term used by cybercriminals to describe "a package of all the personal and financial records that thieves would need to fraudulently open up new lines of credit in a person's name." A Fullz package typically includes the victim's name, address, credit card information, social security number, date of birth, bank name, routing number, bank account numbers and more. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm

60.     Given the type of targeted attack in this case, the sophistication of the criminal claiming responsibility for the Data Breach, the type of PII involved in the Data Breach, the hacker's behavior in prior data breaches, the ability of criminals to link data acquired in the Data Breach with information available from other sources, and the fact that the stolen information has been shared with another hacker, it is reasonable for Plaintiff and the Class Members to assume that their PII was obtained by, or released to, criminals intending to utilize the PII for future identity theft-related crimes or exploitation attempts.

61.     The substantial risk of future identity theft, fraud, or other exploitation that Plaintiff and Class Members face is sufficiently concrete, particularized, and imminent that it necessitates the present expenditure of funds to mitigate the risk. Consequently, Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to understand and mitigate the effects of the Data Breach.

62.     For example, the Federal Trade Commission has recommended steps that data breach victims take to protect themselves and their children after a data breach, including: (i) contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity); (ii) regularly obtaining and reviewing their credit reports; (iii) removing fraudulent charges from their accounts; (iv) closing new accounts opened in their name; (v) placing a credit freeze on their credit; (vi) replacing government-issued identification; (vii) reporting misused Social Security numbers; (viii) contacting utilities to ensure no one obtained cable, electric, water, or other similar services in their name; and (ix) correcting their credit reports.[21]

---

[21]*See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps

63.    As a consequence of the Data Breach, Plaintiff and Class Members sustained or will incur monetary damages to mitigate the effects of an imminent risk of future injury. The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year. The cost of dark web scanning and monitoring services can cost around $180 per year.

64.    As a result of the Data Breach, Plaintiff's and Class Members' PII, which has an inherent market value in both legitimate and illegitimate markets, has been damaged and diminished by its unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the PII is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

65.    Personal information is of great value, in 2019, the data brokering industry was worth roughly $200 billion.[22] Data such as name, address, phone number, and credit history has been sold at prices ranging from $40 to $200 per record.[23] Sensitive PII can sell for as much as $363 per record.[24]

66.    Furthermore, AT&T's poor data security practices deprived Plaintiff and Class Members of the benefit of their bargain. By transacting business with Plaintiff and Class Members, collecting their PII, using their PII for profit or to improve the ability to make profits, and then permitting the unauthorized disclosure of the PII, Plaintiff and Class Members were deprived of the benefit of their bargain.

---

[22]    *Column: Shadowy data brokers make the most of their invisibility cloak*, https://www.latimes.com/business/story/2019-11-05/column-data-brokers

[23] *In the Dark*, VPNOverview, 2019, available at: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/

[24] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

67. When agreeing to pay AT&T for products or services, consumers understood and expected that they were, in part, paying for the protection of their personal data, when in fact, AT&T did not invest the funds into implementing reasonable data security practices. Accordingly, Plaintiff and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with AT&T.

68. Through this Complaint, Plaintiff seeks redress individually, and on behalf of all similarly situated individuals, for the damages that resulted from the Data Breach.

## CLASS ALLEGATIONS

69. Plaintiff brings this nationwide class action individually, and on behalf of all similarly situated individuals, pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

70. The Class that Plaintiff seeks to represent is defined as follows:

**Nationwide Class**
All AT&T cellular customers from May 1, 2022, to October 31, 2022 and January 2, 2023, residing in the United States whose PII was accessed and acquired by an unauthorized party as a result of a data breach that was reported by Defendant AT&T (the "Class").

**South Carolina Subclass**
All AT&T cellular customers from May 1, 2022, to October 31, 2022 and January 2, 2023, residing in South Carolina whose PII was accessed and acquired by an unauthorized party as a result of a data breach that was reported by Defendant AT&T (the "South Carolina Subclass").

**Georgia Subclass**
All AT&T cellular customers from May 1, 2022, to October 31, 2022 and January 2, 2023, residing in Georgia whose PII was accessed and acquired by an unauthorized party as a result of a data breach that was reported by Defendant AT&T (the "Georgia Subclass").

71. Collectively, the Class, Georgia Subclass, and South Carolina Subclass are referred to as the "Classes" or "Class Members."

72.    Excluded from the Classes are the following individuals and/or entities: AT&T and AT&T's parents, subsidiaries, affiliates, officers and directors, and any entity in which AT&T has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

73.    Plaintiff reserves the right to amend the definitions of the Classes or add a Class or Subclass if further information and discovery indicate that the definitions of the Classes should be narrowed, expanded, or otherwise modified.

74.    <u>Numerosity</u>: The members of the Classes are so numerous that joinder of all members is impracticable, if not completely impossible. While the exact number of Class Members is unknown to Plaintiff at this time and such number is exclusively in the possession of AT&T, upon information and belief, 109 million individuals were impacted in Data Breach.

75.    Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting solely individual members of the Classes. The questions of law and fact common to the Classes that predominate over questions which may affect individual Class Members, includes the following:

a.  Whether and to what extent AT&T had a duty to protect the PII of Plaintiff and Class Members;

b.  Whether AT&T had a duty not to disclose the PII of Plaintiff and Class Members to unauthorized third parties;

c.  Whether AT&T failed to adequately safeguard the PII of Plaintiff and Class Members;

d.  Whether AT&T required its third-party vendors to adequately safeguard the PII of Plaintiff and Class Members;

e.  When AT&T actually learned of the Data Breach;

f.  Whether AT&T adequately, promptly, and accurately informed Plaintiff and Class Members that their PII had been compromised;

     g.   Whether AT&T violated the law by failing to promptly notify Plaintiff and Class Members that their PII had been compromised;

     h.   Whether AT&T failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

     i.   Whether AT&T adequately addressed and fixed the practices, procedures, or vulnerabilities which permitted the Data Breach to occur;

     j.   Whether Plaintiff and Class Members are entitled to actual damages, statutory damages, and/or nominal damages as a result of AT&T's wrongful conduct;

     k.   Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and ongoing harm faced as a result of the Data Breach.

76.    <u>Typicality</u>: Plaintiff's claims are typical of those of the other members of the Classes because Plaintiff, like every other Class Member, were exposed to virtually identical conduct and now suffer from the same violations of the law as each other member of the Classes.

77.    <u>Policies Generally Applicable to the Class</u>: This class action is also appropriate for certification because AT&T acted or refused to act on grounds generally applicable to the Classes, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate for the Classes as a whole. AT&T's policies challenged herein apply to and affect Class Members uniformly, and Plaintiff's challenges of these policies hinge on AT&T's conduct with respect to the Classes as a whole, not on facts or law applicable only to Plaintiff.

78.    <u>Adequacy</u>: Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiff seeks no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages suffered are typical of other Class Members. Plaintiff has retained counsel experienced in complex class action and data breach litigation, and Plaintiff intends to prosecute this action vigorously.

79.    <u>Superiority and Manageability</u>: The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like AT&T. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

80.    The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief for the wrongs alleged because AT&T would necessarily gain an unconscionable advantage since AT&T would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Classes and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

81.    The litigation of the claims brought herein is manageable. AT&T's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class

Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

82.    Adequate notice can be given to Class Members directly using information maintained in AT&T's records.

83.    Unless a Class-wide injunction is issued, AT&T may continue in its failure to properly secure the PII of Classes, AT&T may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and AT&T may continue to act unlawfully as set forth in this Complaint.

84.    Further, AT&T has acted on grounds that apply generally to the Classes as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class- wide basis.

85.    Likewise, particular issues under Rule 42(d)(1) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a.  Whether AT&T failed to timely notify the Plaintiff and the Classes of the Data Breach;

    b.  Whether AT&T owed a legal duty to Plaintiff and the Classes to exercise due care in collecting, sharing, storing, and safeguarding their PII;

    c.  Whether AT&T's (or their vendors') security measures to protect its network were reasonable in light of industry best practices;

    d.  Whether AT&T's (or their vendors') failure to institute adequate data protection measures amounted to negligence;

    e.  Whether AT&T failed to take commercially reasonable steps to safeguard consumer PII;

    f.  Whether AT&T made false representations about their data privacy practices and commitment to the security and confidentiality of customer information; and

g.  Whether adherence to ISO/IEC 27000 series recommendations and best practices or other relevant industry standards for protecting personal information in cloud environments would have reasonably prevented the Data Breach.

## **CAUSES OF ACTION**
### (*On behalf of Plaintiff and the Classes*)

### COUNT 1: NEGLIGENCE/NEGLIGENCE *PER SE*

86.     Plaintiff re-alleges and incorporates by reference all the allegations contained in the foregoing paragraphs as if fully set forth herein.

87.     AT&T requires their customers, including Plaintiff and Class Members, to submit PII in the ordinary course of providing products or services.

88.     AT&T gathered and stored the PII of Plaintiff and Class Members as part of its business of soliciting its services to customers. Plaintiff and Class Members entrusted AT&T with their PII with the understanding that AT&T would adequately safeguard their information.

89.     AT&T had full knowledge of the types of PII it collected and the types of harm that Plaintiff and Class Members would suffer if that data was accessed and exfiltrated by an unauthorized third-party.

90.     By collecting, storing, sharing, and using the Plaintiff's and Class Members' PII for commercial gain, AT&T assumed a duty to use reasonable means to safeguard the personal data it obtained.

91.     AT&T's duty included a responsibility to ensure it: (i) implemented reasonable administrative, technical, and physical measures to detect and prevent unauthorized intrusions into its information technology and/or cloud environments; (ii) contractually obligated its vendors to adhere to the requirements of AT&T's privacy policy; (iii) complied with applicable statutes and data protection obligations; (iv) conducted regular privacy assessments and security audits of

AT&T's and/or its vendors' data processing activities; (v) regularly audited vendors for compliance with contractual and other applicable data protection obligations; (vi) provided timely notice to individuals impacted by a data breach event; and (vii) all employees and contractors adhered to the AT&T Security Policy and Requirements and/or regularly updated the requirements.

92.     AT&T had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits unfair or deceptive trade practices that affect commerce. Deceptive practices, as interpreted by the FTC, include failing to adhere to a company's own published privacy policies.

93.     AT&T also had a duty to exercise appropriate clearinghouse practices to remove PII that AT&T was no longer required to retain.

94.     AT&T had a duty to notify Plaintiff and the Classes of the Data Breach promptly and adequately. Such notice was necessary to allow Plaintiff and the Classes to take steps to prevent, mitigate, and repair any fraudulent usage of their PII.

95.     AT&T violated Section 5 of the FTC Act by failing to adhere to its own privacy policy regarding the confidentiality and security of Plaintiff's and Class Members information. AT&T further violated Section 5 of the FTC Act, and other state consumer protection statutes by failing to use reasonable measures to protect PII. AT&T's violations of Section 5 of the FTC Act, and other state consumer protection statutes, constitutes negligence *per se.*

96.     AT&T breached its duties, and thus was negligent, by failing to use reasonable measures to protect Plaintiff's and Class Members' PII. The specific negligent acts and omissions committed by AT&T includes, but are not limited to, the following:

> a. Failing to implement organizational controls, including multifactor authentication in cloud environments.

b. Failing to encrypt personally identifying information in transit and at rest.

c. Failing to adopt, implement, and maintain adequate security measures to safeguard PII.

d. Failing to adequately monitor the security of their cloud services vendors.

e. Allowing unauthorized access to PII.

f. Failing to detect in a timely manner that PII had been compromised.

g. Failing to remove former customers' PII it was no longer required to retain.

h. Failing to timely and adequately notify Plaintiff and Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

i. Failing to implement data security practices consistent with AT&T's published privacy policies and standards.

97. Plaintiff and Class Members were within the class of persons the Federal Trade Commission Act was intended to protect and the type of harm that resulted from the Data Breach was the type of harm the statue was intended to guard against.

98. The injuries resulting to Plaintiff and the Classes because of AT&T's failure to use adequate security measures was reasonably foreseeable.

99. Plaintiff and the Classes were the foreseeable victims of a data breach. AT&T knew or should have known of the inherent risks in collecting and storing PII, the critical importance of protecting that PII, and the necessity of strong authentication mechanisms for accessing cloud services.

100. Plaintiff and the Classes had no ability to protect the PII in AT&T's possession. AT&T was in the best position to protect against the harms suffered by Plaintiff and the Classes as a result of the Data Breach.

101. But for AT&T's breach of duties owed to Plaintiff and the Classes, their PII would not have been compromised. There is a close causal connection between AT&T's failure to

implement reasonable security measures to protect PII and the harm, or risk of imminent harm, suffered by Plaintiff and the Classes.

102.    As a result of the Data Breach, Plaintiff and Class Members suffered injuries including, but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) experiencing an increase in spam calls, texts, and/or emails; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and increased risk their PII will be misused, where: (a) their data remains unencrypted and available for unauthorized third parties to access; and (b) remains backed up under AT&T's possession or control and is subject to further unauthorized disclosures so long as AT&T fails to implement appropriate and reasonable measures to protect the PII.

103.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

104.    Plaintiff and Class Members are also entitled to injunctive relief requiring AT&T to: (i) strengthen its data protection procedures; (ii) implement strong authentication mechanisms for accessing cloud services; and (iii) to provide adequate dark web monitoring and credit monitoring to all affected by the Data Breach.

## COUNT 2: BREACH OF IMPLIED CONTRACT

105.    Plaintiff re-alleges and incorporates by reference all the allegations contained in the foregoing paragraphs as if fully set forth herein.

106.    AT&T requires their customers, including Plaintiff and Class Members, to submit PII in the ordinary course of providing products or services.

107.    AT&T published a privacy policy to inform the public about how AT&T collects, uses, shares, and protects the information AT&T gathers in connection with the provision of those products or services.

108.    In so doing, Plaintiff and Class Members entered implied contracts with AT&T by which AT&T agreed to use reasonable technical, administrative, and physical safeguards to protect against unauthorized access to, use of, or disclosure of the personal information it collects and stores.

109.    Plaintiff and Class Members would not have entrusted their PII to AT&T in the absence of an expressed or implied promise to implement reasonable data protection measures.

110.    Plaintiff and Class Members fully and adequately performed their obligations under the implied contract with AT&T.

111.    AT&T breached the implied contract with Plaintiff and Class Members which arose from the course of conduct between the parties, as well as disclosures on AT&T's website, privacy policy, and in other documents, all of which created a reasonable expectation that the personal information AT&T collected would be adequately protected and that AT&T would take such actions as were necessary to prevent unauthorized access to, use of, or disclosure of such information.

112.    As a direct and proximate result of AT&T's breach of an implied contract, Plaintiff and Class Members suffered injuries including, but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) experiencing an increase in spam calls, texts, and/or emails; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and increased risk their PII will be misused, where:

(a) their data remains unencrypted and available for unauthorized third parties to access; and (b) remains backed up under AT&T's possession or control and is subject to further unauthorized disclosures so long as AT&T fails to implement appropriate and reasonable measures to protect the PII.

113.    Plaintiff and Class Members are also entitled to injunctive relief requiring AT&T to: (i) strengthen its data protection procedures; (ii) implement strong authentication mechanisms for accessing cloud services; and (iii) to provide adequate dark web monitoring and credit monitoring to all affected by the Data Breach.

## COUNT 3: UNJUST ENRICHMENT

114.    Plaintiff re-alleges and incorporates by reference all the allegations contained in the foregoing paragraphs as if fully set forth herein.

115.    Plaintiff brings this Count in the alternative to the breach of implied contract count above.

116.    By providing their PII, Plaintiff and Class Members conferred a monetary benefit on AT&T. AT&T used the PII to market, advertise, and sell additional services to Plaintiff and Class Members. AT&T knew that Plaintiff and Class Members conferred a benefit upon it and has accepted and retained that benefit.

117.    By collecting the PII, AT&T was obligated to safeguard and protect such information, to keep such information confidential, and to timely and accurately notify Plaintiff and Class Members if their data had been compromised or stolen.

118.    AT&T failed to secure Plaintiff's and Class Members' PII and, therefore, it would be unjust for AT&T to retain any of the benefits that Plaintiff and Class Members conferred upon AT&T without paying value in return.

119.    As a direct and proximate result of the AT&T's conduct, Plaintiff and Class Members suffered injuries including, but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) experiencing an increase in spam calls, texts, and/or emails; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and increased risk their PII will be misused, where: (a) their data remains unencrypted and available for unauthorized third parties to access; and (b) remains backed up under AT&T's possession or control and is subject to further unauthorized disclosures so long as AT&T fails to implement appropriate and reasonable measures to protect the PII.

120.    Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from AT&T and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by AT&T from its wrongful conduct.

## COUNT 4: INVASION OF PRIVACY

121.    Plaintiff re-alleges and incorporates by reference all the allegations contained in the foregoing paragraphs as if fully set forth herein.

122.    Plaintiff and Class Members had a legitimate expectation of privacy in their personally identifying information. Plaintiff and Class Members were entitled to the protection of this information from disclosure to unauthorized third parties.

123.    AT&T owed a duty to Plaintiff and Class Members to keep their PII confidential.

124.    AT&T permitted the public disclosure of Plaintiff's and Class Members' PII to unauthorized third parties.

125.    The PII that was disclosed without the Plaintiff's and Class Members' authorization was private and confidential. The public disclosure of the type of PII at issue here would be highly offensive to a reasonable person of ordinary sensibilities.

126.    AT&T permitted its information technology environment to remain vulnerable to foreseeable threats, which created an atmosphere for the Data Breach to occur. Despite knowledge of the substantial risk of harm created by these conditions, AT&T intentionally disregarded the risk, thus permitting the Data Breach to occur.

127.    By permitting the unauthorized disclosure, AT&T acted with reckless disregard for the Plaintiff's and Class Members' privacy, and with knowledge that such disclosure would be highly offensive to a reasonable person. Furthermore, the disclosure of the PII at issue was not newsworthy or of any service to the public interest.

128.     AT&T was aware of the potential of a data breach and failed to adequately implement appropriate policies and procedures to prevent the unauthorized disclosure of Plaintiff's and Class Members' data.

129.    AT&T acted with such reckless disregard as to the safety of Plaintiff's and Class Members' PII to rise to the level of intentionally allowing the intrusion upon the seclusion, private affairs, or concerns of Plaintiff and Class Members.

130.    Plaintiff and Class Members have been damaged by the invasion of their privacy in an amount to be determined at trial.

**COUNT 5: UNAUTHORIZED DISCLOSURE OF CUSTOMER PROPRIETARY INFORMATION**

131.    Plaintiff re-alleges and incorporates by reference the paragraphs above as if fully set forth herein.

132. AT&T collected information that relates to the quantity, technical configuration, type, destination, location, and amount of use of the telecommunications service subscribed to by its customers, including Plaintiff and Class Members.

133. Under the Telecommunications Act of 1996, 47 U.S.C. § 222, AT&T has a duty to protect the confidentiality of customer proprietary information and is prohibited from disclosing customer information except as required by law or with the customer's permission.

134. AT&T failed to protect the confidentiality of Plaintiff's and Class Members' proprietary information, which resulted in customer proprietary information being disclosed to an unauthorized third party in or around April 2024.

135. AT&T violated the Telecommunications Act of 1996, 47 U.S.C. § 222, by failing to use reasonable measures to protect Plaintiff's and Class Members' proprietary information from disclosure and not complying with Defendants own security standards, privacy policy, or other applicable industry standards. AT&T's conduct was particularly unreasonable given the nature and amount of customer proprietary information it obtained, stored, and disseminated, and the foreseeable consequences of a data breach involving a company as large as AT&T.

136. AT&T breached its duties to Plaintiff and Class Members under the Telecommunications Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard CPNI. Furthermore, AT&T had a duty to: (i) conduct privacy impact assessments for each cloud services vendor; (ii) examine each vendor's reputation regarding data breaches; (iii) determine whether each vendor has obtained industry certifications for their privacy practices; (iv) assess whether each vendor has adequate security measures (technical and administrative) to protect the data being shared; (v) ensure each vendor is contractually obligated to comply with the requirements of AT&T's Privacy Notice or other

privacy/security obligations concerning the data; and, (vi) monitor the vendor's practices, annually, to ensure they continue to comply with its contractual privacy obligations and industry best practices.

137.    As a result of AT&T's failure to adequately protect the CPNI from unauthorized disclosure, AT&T is liable for the full amount of damages sustained in consequence of its violation of the provisions of the Telecommunications Act, together with attorneys' fees.

138.    As a direct and proximate result of AT&T's conduct, Plaintiff and Class Members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, and certainly impending targeted messaging (calls, texts, and emails) designed to deceive Plaintiff and Class Members into disclosing sensitive information, or otherwise perpetrate identity theft crimes, fraud, and other exploitation, resulting in monetary loss and economic harm; expenses and time spent erasing addresses, phone numbers, and other details from the internet; expenses for purchasing a secondary phone number or purchasing applications used to create a secondary phone number to keep Plaintiff and Class Members actual phone numbers hidden; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of the privacy and the confidentiality of personal information; mitigation expenses and time spent in response to the Data Breach; lost work time; lost value of the CPNI or lost value of access to the CPNI permitted by AT&T; the amount of the actuarial present value of ongoing high-quality identity defense, credit monitoring services, and dark web monitoring services made necessary as mitigation measures because of AT&T's Data Breach; lost benefit of the bargain and overcharges for services or products; attorneys' fees, nominal and general damages and other economic and noneconomic harm.

## COUNT 6: DECLARATORY JUDGMENT

139.    Plaintiff re-alleges and incorporates by reference the paragraphs above as if fully set forth herein.

140.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the statutes described in this Complaint.

141.    An actual controversy has arisen in the wake of AT&T's data breach regarding its present and prospective common law and other duties to reasonably safeguard its customers' PII and whether AT&T is currently maintaining data security measures adequate to protect consumers from further unauthorized disclosures of their PII.

142.    Plaintiff alleges that AT&T's data security measures remain inadequate. Plaintiff will continue to suffer injury as a result of the compromise of their PII and remain at imminent risk that further compromises of their PII will occur in the future.

143.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

> j.    AT&T continues to owe a legal duty to secure PII and to timely notify consumers of a data breach under the common law, Section 5 of the FTC Act, and various state statutes.
>
> k.    AT&T continues to breach this legal duty by failing to employ reasonable measures to secure Plaintiff and Class Members' PII.

144.    The Court also should issue corresponding prospective injunctive relief requiring that AT&T employs adequate data protection practices consistent with law and industry standards for both its information technology environment and that of its cloud service vendors.

145.    If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach. The risk of another such breach is real, immediate, and substantial. If another breach occurs, Plaintiff will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

146.    The hardship to Plaintiff if an injunction is not issued exceeds the hardship to AT&T if an injunction is issued. Among other things, if another massive data breach occurs, Plaintiff will likely be subjected to fraud, identity theft, and other harms described herein. On the other hand, the cost to AT&T of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and AT&T has a pre-existing legal obligation to employ such measures.

147.    Considering AT&T's history of data breaches, the issuance of the requested injunction will not do a disservice to the public interest. To the contrary, such an injunction would benefit the public by encouraging AT&T to take necessary action to prevent another data breach, thus eliminating the additional injuries that would result to Plaintiff and the millions of individuals whose PII would be at risk of future unauthorized disclosures.

### **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, individually and on behalf of the other members of the Classes alleged herein, respectfully requests that the Court enter judgment as follows:

A.    For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff(s) as the representatives for the Classes and counsel for Plaintiff(s) as Class Counsel;

B.    For an order declaring the AT&T's conduct violates the statutes and causes of action referenced herein;

C.    For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

D.  Ordering AT&T to pay for lifetime credit monitoring and dark web monitoring services for Plaintiff and the Classes;

E.  For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

F.  For prejudgment interest on all amounts awarded;

G.  For an order of restitution and all other forms of equitable monetary relief requiring the disgorgement of the revenues wrongfully retained as a result of the AT&T's conduct;

H.  For injunctive relief as pleaded or as the Court may deem proper; and

I.  For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit, and any other expense, including expert witness fees; and

J.  Such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all claims in this Complaint and of all issues in this action so triable as of right.

Dated: July 19, 2024.

By: /s/ *Brent M. Kaufman*
Brent M. Kaufman, Esq.
GA Bar No.: 441430
**POULIN | WILLEY | ANASTOPOULO**
One Glenlake Parkway NE, Suite 650
c/o Go Big Injury Law
Atlanta, GA 30328
843-222-2222
teamkaufman@poulinwilley.com

-AND-

Paul J. Doolittle, Esq.[*]
**POULIN | WILLEY | ANASTOPOULO**
32 Ann Street
Charleston, SC 29403
Telephone: (803) 222-2222
Fax: (843) 494-5536

Email: paul.doolittle@poulinwilley.com
   cmad@poulinwilley.com

*Attorneys for Plaintiff*

*\*Pro Hac Vice forthcoming*